**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **DEBORAH L. AMICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:05-CV-264** |
| | ) | |
| **VISITING NURSE AND HOSPICE HOME,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment filed by the

Defendant, Visiting Nurse and Hospice Home ("VNHH"), on May 5, 2006. The Plaintiff,

Deborah L. Amick ("Amick"), filed a response in opposition to the motion on July 3, 2006, and

VNHH filed a reply on July 24, 2006. For the reasons discussed in this Order, the motion for

summary judgment is DENIED.

**I. FACTUAL BACKGROUND[1]**

Amick has suffered from type one diabetes for the past thirty-five years. Currently, she

uses an insulin pump to administer insulin based on basal and bolus rates.[2] To maintain her blood

sugar level within a safe range, Amick must follow a strict daily regimen of diet and exercise and

also checks her blood sugar at least five times a day, making adjustments to her diet and exercise

regime accordingly. Furthermore, when doing activities that involve physical exertions, such as

exercise, household cleaning, shopping, walking, running, or playing, Amick monitors her sugar

---

[1] For summary judgment purposes, the facts are recited in the light most favorable to Amick, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[2] The basal rate is determined by Amick's doctor, while the bolus rate is calculated by Amick at every meal she eats by applying a ratio of one unit of insulin for every twelve carbohydrates she consumes.

level more closely. She is also more vigilant in monitoring her sugar level while driving and has

food readily available in her car in case her sugar level is too low.  Despite these limitations,

Amick is able to attend to her personal care needs daily, which include showering, fixing her

hair, cleaning the house, cooking, and shopping. She also is able to ambulate fully.

On January 10, 2001, VNHH hired Amick as a "Medical Social Worker," which entailed

driving to patients' homes to provide social services to them and their families. At the time

Amick was hired, VNHH knew that she had insulin dependant diabetes but noted that it did not

disqualify her from the position.[3]

In December 2003, Doctor David Sorg ("Dr. Sorg"), Amick's endocrinologist,

recommended that she gain tight control over her blood sugar levels because her kidney was not

functioning properly. Concerned that this would result in an increased risk of hypoglycemic

episodes, Amick asked Dr. Sorg to write to VNHH requesting that she cut back on her driving.

Dr. Sorg obliged, writing to VNHH:

> [Amick] is on an insulin pump with fairly good glucose control. She has,
> however, become more apprehensive about hypoglycemic reactions when is
> driving. Until such time as we can deal with that more specifically, I have
> recommended that she work in a position in which driving is not necessary or
> very minimal. This would be for a period of perhaps six months.

(Pl.'s Resp. to Def.'s Mot. for Summ. J. & Designation of Evidence ("Pl.'s Resp.") Ex. 18.)

Upon learning of Amick's kidney problems, Peggy Longardner ("Longardner"), VNHH's

Human Resources Officer, forbade Amick to drive at work and ordered her to stay in the office

---

[3] Within the first six months of her employment, Amick had an incident of low blood sugar at work but did not lose consciousness. Co-workers recognized that Amick was having an insulin reaction and took her to VNHH's Hospice Home to get food. Amick claims that she received negative treatment following this incident, particularly from the Patient Care Coordinator of the Hospice Home who allegedly told Amick that she was not to return to the Hospice Home to get food or to work. Amick, however, makes no legal arguments regarding this incident in her response brief.

and do paperwork. Amick worked in the office for about a week, but spent most of her time helping co-workers, particularly the volunteer coordinator, because she had completed her paperwork and had nothing else to do.

In early January 2004, Longardner and Theresa Judy ("Judy"), Amick's supervisor, met with Amick. Judy suggested that Amick might be able to ride with VNHH nurses to patients' homes; however, Judy also indicated that she had to check with the nurses first. Although Amick expressed interest, neither Judy nor Longardner ever got back to her with a decision regarding whether she could ride with the nurses. Amick was also informed that she was to continue to stay in the office but was no longer permitted to help the volunteer coordinator.

Because she was frustrated at having nothing to do, on January 6, 2004, Amick asked Longardner for a leave of absence. According to Amick, Longardner was eager to place her on FMLA leave and did not question why she was taking the leave. Dr. Sorg completed the FMLA certification on January 13, 2004, writing that Amick had "frequent hypoglycemia" and was "dangerous to drive."[4] (Pl.'s Resp. Ex. 19.)

By mid-March, Amick's kidney had repaired itself; therefore she no longer needed to keep her blood sugar levels under tight control. Accordingly, Dr. Sorg wrote a release to VNHH stating that Amick "has had no further hypoglycemic problems and may return to work and resume driving." (Def.'s Mot. for Summ. J. Ex. S.) Before returning to work, Amick wanted to inquire about an opening for a part time bereavement counselor, but in the end she never directly asked about the position. Instead, she commented to Longardner that her doctor would probably

---

[4] Amick contends that Dr. Sorg never advised her that she should not drive or that it was unsafe for her to drive.

3

like her to work part time. According to Amick, Longardner responded, "Your job is full time, and it requires driving." (The Dep. of Deborah L. Amick ("Amick Dep.") 85-86.) After Longardner's reaction, Amick did not ask her about the part time position.

In mid-June 2004, Amick again broached the subject of working part time by commenting to Judy, "I have a doctor's appointment coming up . . . . [Dr. Sorg] usually talks about going part time . . . . [I]s there any possibility of me working part time?" (Amick Dep. 128.) Judy responded, "I don't see how that is possible." (Amick Dep. 128.) On August 2, Amick specifically requested to work part time, but this time she provided a note from her psychiatrist stating that she was "[m]edically unable to work for more than 25 hours a week." (Pl.'s Resp. Ex. 16.) Accordingly, Judy reduced Amick's schedule, effective that day.[5]

On August 4, Amick had an appointment at a patient's house. Before embarking on the fifteen minute drive, she checked her blood sugar level, which indicated that she did not have to make any adjustments. En route she ate some fruit, and she was fine while driving and upon arrival. However, a VNHH nurse was running behind schedule and was still at the patient's home when Amick arrived, causing Amick's appointment to be delayed.

While she was counselling the patient's wife, Amick had a severe hypoglycemic episode.[6] The patient's wife called Judy, relaying that something was wrong with Amick and that Amick was unresponsive. Judy advised the patient's wife to call 911. When Judy arrived at

---

[5] Amick contends, however, that she was still required to carry her full case load.

[6] Amick provides no further details regarding what happened during the episode, ostensibly because she does not recall what happened. Indeed, in an incident report Amick indicated that the last thing she remembered was having a conversation with the patient's wife, and "my next memory was [sic] EMT standing next to me and there was [sic] IV in my arm." (Def.'s Mot. for Summ. J. Ex. W.) Therefore, the following details are taken from VNHH's account of the hypoglycemic episode, which Amick does not dispute.

the home, two First Responders were trying to get Amick to drink a soft drink, but Amick was not responding and was unable to swallow. When the EMS arrived, the EMTs started an IV, and within a few minutes Amick regained consciousness. The EMTs then asked the patient's wife to make Amick a sandwich. Amick declined going to the hospital, but Judy drove Amick home because she felt it was unsafe for Amick to drive.

Amick claims that because of the nurse's delay, too much time intervened between blood sugar checks, causing her insulin shock.[7] She also admitted, however, that she had no symptoms of low blood sugar, had no forewarning that the incident would occur, and that the incident was a total surprise to her.

During work the next day, Amick met with Longardner and Judy. VNHH alleges that Judy and Longardner asked Amick to obtain a doctor's release stating that she could return to work and drive safely, and that arrangements were made to have Amick work in the office part time. Amick, however, disputes these allegations, contending that she was never told she could work in the office. Although she also claims that she was not asked at the meeting to obtain a release from her endocrinologist, she admits that it was clear to her by August 9 that VNHH wanted one.

Amick claims that after returning home from work on August 9, Longardner called to tell her that she could not return to work until further notice and that Longardner had a list of questions for her endocrinologist to answer. Amick further contends that on August 10, Longardner dropped off a letter dated August 11, which included a list of questions for a board

---

[7] Amick contends that she did not consider doing a blood sugar check while in the patient's home because "[n]o one at VNHH ever told [her that she] could take such an intimate, personal action while in a counseling session with a client's family." (Aff. of Deborah L. Amick ¶ 15.)

certified endocrinologist to answer regarding Amick's history of diabetes. The letter also indicated that VNHH found "it necessary to place [Amick] on a leave of absence" until such time as VNHH could inform Amick "in writing of the agency's decision regarding [her] ability to safely perform the essential functions of [her] job . . . ." (Pl.'s Resp. Ex. 2.)

Amick's counsel sent a letter dated August 19 to VNHH's counsel contesting VNHH's request for medical information as "offensively overbroad" and as an "unreasonable invasion" of Amick's privacy. (Pl.'s Resp. Ex. 6.) Amick's counsel also asserted that "there has been an irretrievable breakdown in the work relationship" and wanted to discuss "a reasonable offer of *severance pay* in exchange for Ms. Amick's release and waiver of the various claims we believe she has against VNHH." (Pl.'s Resp. Ex. 6 (emphasis added).)

VNHH's counsel responded with a letter dated August 26, defending VNHH's request for medical information and asserting that it "has a legal obligation to properly evaluate whether Ms. Amick creates a significant risk to herself or others on the job . . . ." (Pl.'s Resp. Ex. 7.) The letter closed with:

> VNHH has agreed to extend the time by which it expects to receive Ms. Amick's medical report, notwithstanding your client's hostile position concerning this matter. Please inform Ms. Amick that VNHH must receive the requested medical documentation by no later than the end of the business day September 10, 2004 if she wishes to pursue a dialogue with VNHH regarding her continued employment with VNHH.

(Pl.'s Resp. Ex. 7.) In a letter dated September 2, Amick's counsel indicated that although Amick continued to disagree with VNHH regarding the extent of the medical information it requested, she agreed to provide the information "[i]n order to preserve her employment . . . ." (Pl.'s Resp. Ex. 8.)

On September 13, Dr. Sorg provided information regarding Amick's diabetes to VNHH.

6

He also opined:

> I . . . could not say with certainty that she can drive an automobile without some
> degree of risk of an insulin reaction which she cannot perceive. Were she to check
> a blood sugar before driving and find it to be above 125, with that she could
> safely drive for at least a fifteen minute span without undue risk of severe
> hypoglycemia.

(Pl.'s Resp. Ex. 11.)

After receiving Dr. Sorg's letter, VNHH consulted Doctor Gregory Schmitt ("Dr.

Schmitt"), its medical director. Upon reviewing Dr. Sorg's letter, conversing with Dr. Sorg, and

discussing the matter with Thomas Andrew Candor ("Candor"), VNHH's Chief Executive

Officer, Dr. Schmitt expressed his concern regarding Amick's ability to drive safely. VNHH

then determined that Amick could not safely fulfill her duties and sent her a letter on October 5,

2004, terminating her employment.

On August 3, 2005, Amick filed a complaint against VNHH, alleging that it

discriminated against her in violation of the Americans with Disability Act ("ADA"), 42 U.S.C.

§ 12111, *et seq.*, when it failed to reasonably accommodate her diabetes. Furthermore, Amick

claims that VNHH fired her in retaliation for filing a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") on September 20, 2004.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of

material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court

"may not make credibility determinations, weigh the evidence, or decide which inferences to

draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for

summary judgment is "to decide, based on the evidence of record, whether there is any material

dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### III. DISCUSSION

### A. Amick's ADA Claim.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a); *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). In addition, "[t]he Act also provides that an employer discriminates against a qualified individual with a disability by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000) (quoting 42 U.S.C. § 12112(b)(5)(A)). As such, "there are two distinct categories of disability discrimination claims: failure to accommodate and disparate treatment." *Basith*, 241 F.3d at 927 (quoting *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997)).

Here, Amick alleges that VNHH failed to reasonably accommodate her diabetes by not

8

permitting her to check her blood sugar more often. To establish a claim for failure to accommodate, Amick must demonstrate that: (1) she is a qualified individual with a disability; (2) VNHH was aware of her disability; and (3) VNHH failed to reasonably accommodate the disability. *E.E.O.C. v. Sears, Roebuck, & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). In its motion, VNHH contends that Amick cannot show that she suffers from a disability within the meaning of the ADA or that she was a "qualified individual." VNHH also argues that it cannot be held liable for a failure to provide a reasonable accommodation for Amick because it engaged in an interactive process with her.

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see also Wright v. Ill. Dep't of Corr.*, 204 F.3d 727, 730 (7th Cir. 2000). Here, neither side disputes that Amick's diabetes is a physical impairment. Rather, the parties focus their arguments on whether Amick's diabetes substantially limits a major life activity such as eating, thinking, working, or caring for herself. Alternatively, Amick argues that VNHH regarded her as impaired in these activities.

### 1. *Amick Raises a Genuine Issue as to Whether She Is Substantially Limited in a Major Life Activity*

A plaintiff's diabetic status does not *per se* qualify as a disability. *Nawrot v. CPC Int'l*, 277 F.3d 896, 904 (7th Cir. 2002). Instead, a plaintiff's diabetes must substantially limit a major life activity, which means that the plaintiff is "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life

activity as compared to the condition, manner, or duration under which the average person in the

general population can perform that same major life activity." 29 C.F.R. § 1630.2(j).

A "major life activity" includes "functions such as caring for oneself, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §

1630.2(i). "Such activities need not have a public or economic character to them; they must

simply be 'central to the life process itself.'" *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923

(7th Cir. 2001) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998)). The Seventh Circuit has

previously recognized that, in addition to the activities listed in the regulations, eating and

thinking are also major life activities for a diabetic plaintiff. *See Lawson*, 245 F.3d at 924

(eating); *Nawrot*, 277 F.3d at 905 (thinking).

When determining whether Amick is substantially limited in a major life activity, the

crucial inquiry is whether Amick's "limitation[s] [are] substantial or considerable in light of

what most people do in their daily lives, and whether the impairment's effect[s] [are] permanent

or long term." *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006) (quoting *E.E.O.C. v. Sears,

Roebuck & Co.*, 417 F.3d 789, 801 (7th Cir. 2005)).  Amick contends that she is substantially

limited in the life activity of eating because she is "never free to eat whatever she pleases

whenever she pleases." (Pl.'s Resp. 4.) Indeed, her diet is dependant on the blood sugar readings

she takes five times a day, and she must adjust her diet throughout the day to compensate for

physical exertion. Furthermore, she must keep food in her car in case of a hypoglycemic

reaction. Under similar circumstances, the Seventh Circuit concluded in *Branham v. Snow*, 392

F.3d 896, 902 (7th Cir. 2004), that "a trier of fact rationally could determine that [plaintiff's]

diabetes and the treatment regimen that he must follow substantially limit him in the major life

activity of eating."[8] *See also*, *Lawson*, 245 F. 3d at 924-26 (concluding that a diabetic plaintiff was substantially limited in eating based on the severity of dietary restrictions and the "dangerous consequences that could result from the failure to maintain them"). Accordingly, Amick has raised a genuine issue as to whether she is substantially limited in the major life activity of eating.

More importantly, Amick raises a genuine issue as to whether she is substantially limited in her ability to think and to care for herself. These activities were certainly impaired during the August 4 incident, and Amick presents evidence to demonstrate that the effect of her diabetes on her ability to think and care for herself may be permanent or at least long-term.[9]

2. *Amick Raises a Genuine Issue as to Whether VNHH Regarded Her as Disabled*

Even if a plaintiff does not suffer from an impairment that substantially limits a major life activity, she still falls under the ambit of the ADA if her employer regarded her as disabled. An employee is regarded as disabled if "1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or 2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits a major life activity." *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002). Stated another way, the employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.*

---

[8] Although the plaintiff in *Branham* sued under the Rehabilitation Act, the Seventh Circuit noted that in the employment context, the standards of the ADA are used. *See Branham*, 392 F.3d at 902.

[9] For example, despite all her care in managing her diabetes, Amick cannot completely control her blood sugar level and several times a year she suffers from mild to moderate hypoglycemia during the work day and/or while driving. In December of 2003 her kidney was failing due to her diabetes and she took a 2 ½-month leave of absence as a result. Pl.'s Resp., p.3.

(quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)).

Amick contends, as an alternative to her argument offered above, that VNHH mistakenly believed that her diabetes substantially limited the major life activities of eating, thinking, working, and caring for herself. VNHH argues, however, that it only regarded Amick as limited (although not *substantially* limited) in her ability to drive, which is not a major life activity. Amick counters that VNHH's focus on driving is too narrow and that the reasons behind VNHH's position reveal that it regarded her as substantially limited in a major life activity.

Specifically, Amick contends that VNHH regarded her as limited in her ability to drive because it believed she was unsafe to drive. She argues further that VNHH believed she was unsafe to drive because her diabetes could lead to unexpected episodes of unconsciousness. This fact is actually not disputed. Clearly, VNHH did, in fact, believe that Amick was limited in her ability to drive, and ultimately terminated her because she could not perform the essential functions of her job as a result of that limitation. The dispute, rather, is whether VNHH truly believed that Amick could not perform the functions of her job or, alternatively, whether VNHH perceived her as being more disabled in her ability to perform certain essential functions than she actually was. But resolution of this issue would turn predominately on credibility determinations that the court cannot make when ruling on a motion for summary judgment.

Indeed, the very manner in which VNHH treated Amick in the days and weeks following the August 4 incident serve to create an issue of fact with regard to Amick's ability to perform her job with reasonable accommodation. Again, VNHH did, in fact, accommodate Amick on more than one occasion. This occurred twice before the August 4, 2004, incident (in December of 2003, when she worked temporarily in the office, and on August 2, 2004, when she was

permitted to work part time), and once after (on August 5, when she was allegedly told that arrangements had been made again for her to work in the office).[10]

3. *Amick Raises a Genuine Issue as to Whether She is a Qualified Individual*

It is not enough, however, for Amick to be "disabled" under the ADA; rather, in order to prevail, Amick must also show that she is an "otherwise qualified individual" with a disability. A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." 42 U.S.C. § 12111(8). The Seventh Circuit has parsed this definition into a two-part test, requiring a plaintiff to establish that she (1) has the requisite skill, experience, education, and other job-related requirements for her position; and (2) can perform the essential functions of the job, either with or without a reasonable accommodation. *Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998).

VNHH does not dispute that Amick possessed the prerequisites for her position as a medical social worker. Instead, VNHH focuses its argument on the second prong, contending that Amick was unable to perform two essential job functions–driving and performing services at patients' homes–due to the risk of an incapacitating hypoglycemic episode. Amick claims, however, that she could have performed the essential functions of her job if VNHH would have permitted her to check her blood sugar every fifteen minutes. In support of her proposed accommodation, Amick offers Dr. Sorg's September 13, 2004, letter, which opines, "Were she to check a blood sugar before driving and find it to be above 125, with that she could safely drive

---

[10]   Again, the parties dispute exactly what took place the day after Amick passed out.  VNHH maintains that Amick was told that arrangements had been made for her to work in the office again, while she contends she was not told that and that she could not return to work in any capacity until she obtained a doctor's release.

13

for at least a fifteen minute span without undue risk of severe hypoglycemia." (Pl.'s Resp. Ex. 11.) VNHH, however, argues that Dr. Sorg's letter supports its contrary position.[11] Specifically, VNHH contends that Amick's proposed accommodation is insufficient because Dr. Sorg "could not say with certainty that [Amick] can drive an automobile without some degree of risk of an insulin reaction which she cannot perceive." (Pl.'s Resp. Ex. 11.)

Contrary to both parties' positions, Dr. Sorg's letter is hardly "clear evidence" either supporting or opposing a reasonable accommodation. Regardless, as the court must make every reasonable inference in favor of the plaintiff, Dr. Sorg's letter creates a genuine issue as to whether Amick could have performed her job with a reasonable accommodation.

VNHH ostensibly incorporates the "direct threat" defense into its "essential functions" argument, because its concern regarding Amick's alleged inability to perform the essential functions of her job is due to its fear that Amick would pose a safety risk to herself and others if she suffered another severe hypoglycemic episode. If a plaintiff poses "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation," then the plaintiff is not a qualified individual because she is a "direct threat." 29 C.F.R. § 1630.2(r); *Darnell v. Thermafiber*, 417 F.3d 657, 659 (7th Cir. 2005) (citing *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000)). VNHH bears the burden of showing that Amick is a direct threat. *See Branham*, 392 F.3d at 907. This burden is a high one, as VNHH must demonstrate that "the evidence on the question of direct threat is so one-sided no reasonable jury could find for [Amick]." *Id.* (citing *Anderson v.*

---

[11] Curiously, VNHH makes no argument regarding whether the accommodation of allowing Amick to check her blood sugar every fifteen minutes was reasonable.

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The assessment of whether Amick posed a direct threat should take into account four factors: "(1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(c); *Chevron U.S.A. Inc., v. Echazabal*, 536 U.S. 73, 86 (2002); *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001)). Although the second factor clearly favors VNHH's direct threat defense, its evidence in support of the remaining three is not so one-sided that no reasonable jury could find for Amick.

The August 4 incident provides strong evidence in VNHH's favor with regards to the nature and severity of the potential harm. As a result of a hypoglycemia episode, Amick lost consciousness, her patient's wife was forced to become her caretaker, and the EMTs were called to revive her. Indeed, Amick herself characterizes the episode as "severe" and "life threatening." (Pl.'s Resp. 3.) If this incident had occurred while Amick was driving, the risk to the safety of Amick and others would likely have been even more severe. *Cf. Branham*, 392 F.3d at 907 (finding that a reasonable trier of fact could find in the plaintiff's favor on the second factor because "he has never lost consciousness and he never has experienced physical or mental incapacitation as a result of mild hypoglycemia").

The evidence is not so one-sided regarding the duration of the risk and the likelihood and imminence of potential harm. In support of its position, VNHH offers the opinion of Dr. Schmitt, its medical director. After conducting a review, which included a conversation with Dr. Sorg, Dr. Schmitt concluded that he was very concerned about having Amick continue to drive. *See*

15

*Darnell*, 417 F.3d at 660 (noting that an employer's determination that an employee poses a direct threat must be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence"). VNHH also points out that prior to the August 4 incident, Dr. Sorg opined that Amick had frequent hypoglycemia and was unsafe to drive.

Amick counters that she strictly follows her diabetic regimen, that her diabetes is generally well-maintained and under control, and that the August 4 incident was a "fluke." Furthermore, Amick contends that the likelihood of such a severe episode happening again would be greatly reduced if she were allowed to check her blood sugar every fifteen minutes, i.e., if she was given a reasonable accommodation.[12] In the light most favorable to Amick's evidence, a reasonable jury could conclude that the duration of the risk, likelihood, and imminence of another severe hypoglycemic episode is low. *See Branham*, 392 F.3d at 908 ("On this record, a reasonable trier of fact could conclude that [the plaintiff] can prevent severe hypoglycemia from occurring by maintaining his treatment regimen and vigilantly testing his blood sugar levels . . . ."), *with Darnell*, 417 F.3d at 660-62 (concluding that employer produced sufficient evidence that plaintiff was a direct threat where plaintiff's diabetes was unmonitored and uncontrolled).

4. *Amick Raises a Genuine Issue Regarding the Request for a Reasonable Accommodation*

---

[12] In support of this contention, Amick offers Dr. Sorg's September 13 opinion, which was discussed above, and the opinion of Doctor Jose Carlos Espinosa ("Dr. Espinosa"), who is the Medical Director for General Motors. After reviewing Amick's medical records, Dr. Espinosa concluded that "Amick poses no more threat than a non-diabetic driver for drives of less than half an hour if her blood sugar level is at 125 when she begins driving." (Aff. of Jose Carlos Espinosa, M.D. ¶ 7.) VNHH contends that Dr. Espinosa's opinion was not available until Amick filed her response to the motion for summary judgment. Regardless, because it does affect the outcome of this Order, the court will consider Dr. Espinosa's opinion here.

The ADA prohibits discrimination against the disabled, and one form of such discrimination is the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Accordingly, once an employer knows of an employee's disability and the employee has requested reasonable accommodations, the employer must engage in an "interactive process" with the employee to determine what precise accommodations are necessary. *Ross*, 159 F.3d at 1013-14; *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996). Liability for failure to provide reasonable accommodation ensues only when the employer fails to engage in the interactive process or bears responsibility for the breakdown in the process. *E.E.O.C.*, 417 F.3d at 797; *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001); *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000); *Ross*, 159 F.3d at 1013-14. The employer, however, is not *per se* liable when this occurs; rather, the plaintiff must demonstrate that the inadequate interactive process led to the employer's failure to provide reasonable accommodations. *Emerson*, 256 F.3d at 515.

Before reaching the issue of whether fault attaches to VNHH for any alleged inadequacies in the interactive process, Amick must first show that there is a genuine issue regarding the availability of a reasonable accommodation. *See E.E.O.C.*, 417 F.3d at 805 (quoting *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002)) ("The plaintiff cannot seek a judicial remedy for the employer's failure to accommodate her disability without showing that a reasonable accommodation existed."). As discussed *supra*, Amick raises a genuine issue of whether a reasonable accommodation was available. Specifically, Amick makes the requisite showing that if VNHH would have allowed her to check her blood sugar levels every fifteen

minutes, its concerns regarding the possibility of her having another severe hypoglycemic reaction would have been allayed.[13]

Amick contends that after the August 4 incident VNHH refused to consider any accommodation for her diabetes. VNHH argues that Amick's position contains a fatal flaw–in order for VNHH to be liable for its alleged failure to consider a reasonable accommodation, Amick must have actually requested one. *See E.E.O.C.*, 417 F.3d at 803-04; *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 898-99 (7th Cir. 2000) ("[W]e believe that the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."). Amick, however, was not required to use the specific buzz words, "I want a reasonable accommodation," *Bultemeyer*, 100 F.3d at 1285, and the evidence (at least at this point) supports her contention that she was interested in an accommodation.

It is true that the specific accommodation that Amick now seeks–that she be allowed to check her blood sugar every fifteen minutes–ostensibly was not even mentioned until Amick's response to the motion for summary judgment. However, Amick suggests that Dr. Sorg's September 13 letter served as such a request when he opined, "Were she to check a blood sugar before driving and find it to be above 125, with that she could safely drive for at least a fifteen minute span without undue risk of severe hypoglycemia." (Pl.'s Resp. Ex. 11.) It is for a jury to determine whether Dr. Sorg's letter constituted a *request* by Amick for a reasonable

---

[13] Amick also suggests that, per Judy's January 2004 comments, she could have ridden to patients' homes with VNHH nurses. VNHH explains that this accommodation was not reasonable because the nurses' schedules differ from Amick's schedule. This explanation, however, was never offered to Amick and thus cannot be considered here. *See E.E.O.C.*, 417 F.3d at 806 ("An employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives.").

accommodation.[14] *See Bultemeyer*, 100 F.3d at 1282, 1285 (holding that a doctor's note, which stated that "due to [plaintiff's] illness and his past inability to return to work, it would be in his best interest to return to a school that might be less stressful than Northrop High School," was enough to serve as a request for accommodation).  Amick's interest in retaining her job with VNHH was demonstrated in the September 2, 2004, letter from her attorney.  In that letter, counsel stated that Amick would acquiesce to VNHH's request for medical records and information "in order to preserve [Amick's] employment . . . ."  Pl.'s Resp. Exh. 4.

As to the issue of the interactive process, VNHH was required to begin that process once Amick requested an accommodation. *See E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 958-59 (7th Cir. 2001) ("The employee has the affirmative obligation to let the employer know that he is disabled and that he needs an accommodation. . . . Once the employee provides this information, the employer has a responsibility to start the interactive process.") (internal citations omitted). As discussed above, the court has determined that a fact issue exists with regard to whether Amick (or her physician) actually requested any form of accommodation. Likewise, a genuine factual dispute exists regarding whether, or to what degree, an interactive process took place.

The parties dispute whether VNHH engaged in any interactive process throughout the last year of Amick's employment. Amick specifically contests VNHH's claim that throughout this period it "did engage in the informal interactive process with Amick until she obtained counsel . . . ." (Def.'s Br. in Supp. of its Mot. for Summ. J. 18.) For example, Amick contends

---

[14] In contrast, Dr. Sorg's earlier letter (in December 2003) specifically advocated a specific course of action in response to Amick's concern regarding hypoglycemic episodes:  "I have recommended that she work in a position in which driving is not necessary or very minimal." (Pl.'s Resp. 18.)

that VNHH failed to engage in the interactive process with her after her kidney failed. However, after VNHH received Dr. Sorg's letter requesting that Amick work in a position where driving was not necessary or very minimal, VNHH accommodated Amick by allowing her to work in the office even though it was under no obligation to alter the essential functions of her job. *See* 29 C.F.R. Pt. 1630 App.; *Dvorak*, 289 F.3d at 484.

The parties also disagree about VNHH's willingness to engage in the interactive process regarding Amick's desire to work part time. Eventually, just days before the August 4 incident, VNHH acceded to Amick's request after it received a note from her psychiatrist indicating that Amick was medically unable to work more than 25 hours per week. Liability for failure to engage in the interactive process attaches only if it resulted in a failure to accommodate. *See Emerson*, 256 F.3d at 515.  VNHH contends, correctly by all indications, that an accommodation was provided at that point in time.[15]  But following the August 4 incident, the evidence demonstrates that the relationship between Amick and VNHH deteriorated to the point that VNHH was allegedly unwilling to accommodate Amick any more.  Within a day or so, Amick was told that she had to provide VNHH with medical information so the company could make a determination about her employment.  Eventually, after an exchange of letters between Amick's attorney and VNHH's attorney, this information was provided.  Of course, it resulted in Amick's termination rather than a subsequent accommodation.  VNHH contends that its decision was based on a determination that Amick's condition presented a threat of harm either to herself or to the public.  Amick, however, takes the position that the decision was the result of discrimination

---

[15]   Amick maintains, as discussed previously, that she was still required to carry a full case load at that time, and so there exists a dispute about the genuineness of that "accommodation."

in violation of the ADA. Once again, the ultimate resolution of this issue turns largely on credibility determinations, which are not within the court's purview to make at the summary judgment stage.  Accordingly, for all the reasons just discussed, Amick's claim under the ADA must be presented to a jury.

### B. Amick's Retaliation Claim.

In addition to her claim of discrimination under the ADA, Amick alleges that VNHH terminated her in retaliation for filing a charge of discrimination with the EEOC. A plaintiff alleging retaliation can contest summary judgment by using either the direct or indirect method of proof. *Tomanovich v. City of Indianapolis*, No. 05-1653, slip op. at 6 (7th Cir. Aug. 8, 2006). Amick relies on the direct method, which requires her to show that she "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that a causal connection exists between the two."[16] *Id.* at 7.

The causal connection may be established through direct or circumstantial evidence. *Tomanovich*, No. 05-1653, 10; *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006); *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Direct evidence is evidence that "if believed . . . would prove the fact in question without reliance on inference or presumption," *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005), which

---

[16] The indirect method requires a plaintiff to first establish a *prima facie* case of retaliation, which is a showing that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he met the employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) [s]he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* at 13. If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *Scaife v. Cook County*, 446, F.3d 735, 739 (7th Cir. 2006).

Although Amick disputes VNHH's initial argument that it had a valid nondiscriminatory reason for terminating her, she makes no further attempts at fitting her retaliation claim within the confines of the indirect methodology by offering, for instance, any evidence concerning similarly situated employees.

"essentially requires an admission by the decision maker that his actions were based on the prohibited animus." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)). In contrast, "circumstantial evidence can establish a causal link if the trier of fact can *infer* intentional discrimination." *Id.* at 545-46 (emphasis in original).

Here, Amick offers as direct evidence the following statement made by Candor, VNHH's CEO, during his deposition: "[Amick's attorney] made it very clear that [she was] interested in filing with the EEOC . . . . [M]y impression again was we're going to take you to the EEOC." (The Dep. of Thomas Andrew Candor ("Candor Dep.") 49.) Standing alone, this statement might be direct evidence that VNHH fired Amick in retaliation for filing charges with the EEOC. However, VNHH argues that an examination of the statement in its proper context reveals that it is not direct evidence, since it was not offered as a reason for Amick's termination. Instead, Candor made the statement in response to a series of questions posed by Amick's attorney regarding why VNHH failed to directly communicate with Amick. Candor explained that once Amick's counsel sent the August 19 letter, VNHH "felt we weren't able to talk directly to [Amick] because we thought it was lawyer-to-lawyer communication." (Candor Dep. 48.) He further explained that reasonable accommodations were not discussed directly with Amick "because [counsel's] letter had stated that [counsel was] interested in discussing a settlement and severance. So reasonable accommodation was no longer an issue." (Candor Dep. 49.) Finally, he made the following comment, which contains the alleged direct evidence:

> [Counsel's] subsequent letter where you gave permission or approval for this medical information to be obtained from Dr. Sorg, you made it very clear that you were interested in filing with the EEOC, and there was no mention of . . . any interest in accommodation for Deb. . . [M]y impression again was we're going to

take you to the EEOC. And there is no change from your prior letter where you
were referring to an irretrievable breakdown in the employment situation.

(Candor Dep. 49-50.) VNHH maintains that this statement was not an admission by Candor that

the motive for firing Amick was retaliatory, but rather was intended as additional explanation for

why VNHH did not discuss (or, arguably, continue to discuss) an accommodation with Amick.

Amick also contends that "Candor's statement create[s] the causal link between Amick's

protected activity and the termination of the interactive process which directly resulted in

Amick's termination . . . ." (Pl.'s Resp. 14.).

The court does not believe that either party's interpretation of Candor's statement is

conclusive.  If it is true that Candor's statement was intended merely to help explain why the

interactive process ended, then Amick's termination may have had nothing to do with her

allegations of discrimination.  On the other hand, a jury might infer from Candor's statement that

VNHH reached a point of frustration with Amick and/or her situation, and decided to terminate

her once the company believed that an EEOC investigation and possible litigation appeared

unavoidable.  Once again, resolution of this genuine issue depends to a great extent on credibility

determinations that only a jury is empowered to make.  For that reason, summary judgment

cannot be granted on Amick's claim of retaliation.[17]

---

[17]   While Amick does not raise the issue, the timing of her termination could, coupled with Candor's
deposition testimony and other facts, give rise to an inference of retaliation.  Amick's attorney raised at least the
specter of EEOC proceedings (and, perhaps, litigation) in both of her letters to VNHH's attorney–the first on August
19, 2004, and the second on September 2, 2004.  Then, on September 20, Amick filed a Charge of Discrimination
with the EEOC.  She was terminated approximately two weeks later.  The arguably suspicious timing of Amick's
termination, standing alone, would be insufficient to support a reasonable inference of retaliation.  *See Sauzek v.
Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).  However, this temporal proximity, when combined with
other admissible evidence, may be sufficient for a jury to reasonably conclude that Amick's termination was
retaliatory.  *See, e.g., Burks v. Wisconsin Dept. of Transp.*, 2006 WL 2788439 *9 (7th Cir. (Wis.)).

**IV. CONCLUSION**

Based on the foregoing, the Motion for Summary Judgment filed by Visiting Nurse and Hospice Home is DENIED.

Entered: October 18, 2006

  /s/   William C. Lee
William C. Lee, Judge
United States District Court